IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

MARK TITSWORTH,

               Plaintiff,

     vs.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,[1]

             Defendant.

**8:16CV387**

**MEMORANDUM AND ORDER**

The plaintiff, Mark E. Titsworth, appeals the denial, initially and upon reconsideration, of his application for disability benefits under 42 U.S.C. § 405(g), *see* Filing No. 14 (Plaintiff's Motion to Reverse) and Filing No. 17 (Defendant's Motion to Affirm).

I.     BACKGROUND

     A.     Procedural history

The administrative record ("Admin. R.") has been filed with the court. Filing Nos. 8-1 to 8-8, 9-1 to 9-5, and 10-1 to 10-6. Titsworth applied for disability benefits on February 12, 2015. He alleges he is disabled by reason of mental illness—Major Depression and Posttraumatic Stress Disorder ("PTSD"). He alleges an onset date of December 31, 2013. At the time of his alleged onset, he was fifty-three years old. He has a high school education. He served in the United States military from 1978 to 1980 and was the victim of a sexual assault.

Titsworth's application was denied initially and on reconsideration. He appealed the determination and requested a hearing before an administrative law judge ("ALJ"). The ALJ

_____

[1] On January 23, 2017, Nancy A. Berryhill was appointed the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit.

held a hearing on April 4, 2016.  In a decision dated April 27, 2016, the ALJ found that Titsworth was not disabled and therefore not entitled to benefits.  *Id.* at 19[2].  On June 17, 2016, the Appeals Council of the Social Security Administration ("SSA") denied Titsworth's request for review.  *Id.* at 1.  Titsworth seeks review of the ALJ's decision as the final decision of the Commissioner under sentence four of 42 U.S.C. § 405(g).

B.      Testimony at Administrative Hearing

A transcript of the hearing is found in the record at Admin. R. 32 to 68. Titsworth testified that all of his past work since the military was as a self-employed painter with minimal interaction with supervisors and customers.  *Id.* at 39-41.  He stated his income dropped off significantly in 2014 because he was "turning down jobs because I just couldn't do it."  He testified that "[t]he anxiety about even going to bid a job was overwhelming" and related he had constant nightmares, depression and he could not function.  *Id.* at 43-44.  He also testified that when he did work in 2014, the work did not go well because he had problems working with someone watching him, so he would take breaks for 15-20 minutes to calm down, leave early, or show up late.  *Id.* at 45-47. He reported he could not do a job with even minimal interaction with others because he would still have to deal with people and would miss work.  *Id.* at 60-64.  He testified he had trouble even painting a friend's house because of his severe anxiety.  *Id.*

Titsworth testified that he sought treatment for his psychiatric condition in late 2013 or early 2014 because he was suicidal.  *Id.* at 42.  He testified he had planned to go turkey hunting, and would shoot himself under the chin with a shotgun.  *Id.* at 43.  He reported getting depressed and stated on a bad day he could not get off the couch, but would "sit and look at the floor."  *Id.* at 48.

---

[2] References are to consecutive page numbers on the bottom right of each page.

He also reported panic attacks, a rapid heartbeat, profuse sweating, and flashbacks of a sexual assault he suffered in the military. *Id.* at 49-50. He stated he averaged three or four flashbacks a week. *Id.* at 49. He also testified to nightmares that cause poor sleep and stated he requires a nap during the day. *Id.* at 50-51. He stated he used small quantities of marijuana about three or four times a month for sleep because it worked better than medications he had been prescribed for sleep. *Id.* at 53-55. He further testified he had tried to adjust multiple medications and medication levels, but was sensitive and couldn't take many medications. *Id.* at 55.

He stated he attended group therapy four days a week for a while but, because it was difficult for him to bring up the incident, his anxiety and depression worsened. *Id.* at 57. He testified he had been seen by his psychiatrist once a month beginning in early 2014, but had reduced the frequency of his visits to every six weeks by the time of the hearing. *Id.* at 53. He stated he still experiences episodes of rage and "goes off." *Id.* at 46, 53. At a recent job, he stated he missed work, showed up late, left early and took multiple breaks because of anxiety. *Id.* at 47.

A vocational expert ("VE") also testified at the hearing. He was asked whether a hypothetical worker with past relevant work as a painter who "has some functional limits, no exertional limits," and "is able to perform work that is simple and to respond appropriately to routine changes in a work environment[,]" and "to perform work that does not require working in tandem or as a partner or in close coordination with others, and the worker is able to perform work that does not involve more than brief, superficial, and incidental interaction with the public" could find work in the national economy. *Id.* at 59. The VE testified such a hypothetical worker could find jobs in the national economy as an industrial cleaner, night janitor, or production welder. *Id.* at 60. The VE also testified that an

individual who needed to take a break twice an hour for 5 to 10 minutes, or was absent five days per month, or was off-task thirty percent of the work day would not be able to find competitive employment. *Id.* at 66-67.

C.    Medical Evidence

Titsworth has been diagnosed with major depression and PTSD. He has been treated for several years at Veterans' Administration ("VA") facilities. His diagnoses are supported by notes and opinions in the record from psychiatrists, psychologists, and licensed clinical social workers. The record shows Titsworth sought treatment complaining of nightmares, flashbacks, poor sleep, depression, anxiety, irritability, anger, an exaggerated startle response, hyper-vigilance, episodes of rage, and problems with concentration and short-term memory. His medical providers have prescribed multiple psychiatric medications during the course of his care. He is presently taking bupropion, buspirone**,** sertraline, topiramate, and propranolol.[3] *Id.* at 1237

Titsworth was treated at a VA facility by Dr. Willcockson, a psychologist, in January 2014. *Id.* at 808-815. Titsworth told Dr. Willcockson he had a history of sexual assault while on active duty in the military in 1978. He stated he did not report the incident at the time, nor did he seek medical attention because he felt uncomfortable and "he didn't trust anyone at the time and still doesn't." *Id.* at 809. He reported his symptoms included nightmares, high anxiety, low stress tolerance, sleep problems, and fear of crowds. *Id.* He reported nightmares of rape on a daily basis but does not remember the details of the dreams, and stated he had recurrent, intrusive thoughts at least once per week. *Id.* He

---

[3] Bupropion is prescribed for Major Depressive Disorder; buspirone is an antianxiety agent; sertraline is an antidepressant in the class of selective serotonin reuptake inhibitors; topiramate is an anticonvulsant with off-label use for alcohol dependence, bulimia and eating disorders; and propranolol is a beta-blocker prescribed for hypertension.

stated he was unable to talk about his military experiences with anyone.  *Id.*  He reported problems with fatigue, motivation, exaggerated startle responses, and problems with concentration and short term memory.  *Id.* at 810.  Dr. Willcockson diagnosed Titsworth with PTSD secondary to experience of military sexual trauma.  *Id.* at 812.

In April 2014, Titsworth began treatment with Dr. Joanna E. Faryna, his treating psychiatrist at the VA.  He reported flashbacks, hypervigilance, and anger.  She also diagnosed PTSD.  The record shows Dr. Faryna treated Titsworth on a monthly basis.  *See generally id.* at 1237 (indicating frequency of treatment); 463-467, 491-494, 508-511; 559-562, 590-592, 603-606; 622-625, 634-637, 650-653, 662-665, 669-672, 681-684, 689-691, 695-698, 701-705; 732-735, 739-742, 750-753; 952-955, 960, 968; 1000-1003, 1036-1038, 1046-1048; 1125-1128, 1159-1162; 1191, 1217-1219. In June 2014, Titsworth reported to Dr. Faryna that his condition had gotten worse.  *Id.* at 732-735.  He reported he was sleeping more but having more violent dreams of sexual nature and fantasies of killing himself.  *Id.*

Titsworth also underwent group psychotherapy, but was noted to be withdrawn and noncooperative and walked out of the group.  *Id.* at 680.  At various times he reported problems with fatigue, motivation, concentration and short term memory, and exaggerated startle responses, flashbacks, and intrusive thoughts.  The record shows Titsworth missed appointments, left early, or showed up late.  *Id.* at 610 ("Veteran was late to apt today, stating he has been getting his appointments confused"); 968 (Titsworth called in saying he would not be in for groups stating, "I'm too depressed"); 1159 (Titsworth failed to appear for appointment, having "made the decision to go out of town in an impulsive manner.")

He also reported worsening symptoms in June 2014 to clinical social worker, Ms. Erinn Tighe.  *Id.* at 730-732.  He stated he was concerned about his medications and

reported "seeing light spots again" and "dark shapes along the floor." *Id.* at 730. Titsworth again reported worsening symptoms in August 2014. Id. at 681-82. He again admitted to suicidal thoughts. *Id.* at 670. Dr. Faryna increased the dose of topiramate and continued him on sertraline and risperidone. *Id.* at 682.

On September 26, 2014, Titsworth again met with clinical social worker Erinn Tighe. *Id.* at 660-662. He reported anger outbursts. In October 2014, Ms. Tighe noted Titsworth had stopped going to AA meetings. *Id.* at 638-640. Titsworth stated "[h]e has not been able to get off the couch," and reported having nightmares and "larger 'hallucinations' in peripheral vision." *Id.* at 638-40.

In November 2014, Titsworth reported to Dr. Faryna he was feeling depressed and did not feel he was getting any better. *Id.* at 634-637. Dr. Faryna noted Titsworth "may have some visual illusions" but not "true visual hallucinations." *Id.* at 634. In February 2015, Dr. Faryna again noted Titsworth was not doing well, had poor motivation, and was spending a lot of time on the couch. *Id.* at 590-592. He reported anxiety, panic attacks, occasional hallucinations, seeing shapes of "blobs" and sometimes the shape of a person, and hearing noises but not voices. *Id.* at 590.

In March 2015, Titsworth reported problems with rage. *Id.* at 527-533. Titsworth began participating in group therapy and attended most of his scheduled groups, but on occasion he left group early because he was feeling anxious. *Id.* On March 25, 2015, Titsworth asked to meet with social worker, Ms. Colleen Evans. *Id.* at 500-502. He reported he had not been eating or sleeping well. *Id.* Two days later, Titsworth contacted the VA and reported feeling depressed, anxious, stressed, and suicidal. *Id.* at 495-497. He later met with Dr. Faryna and reported he "blew up" at the nurses/staff at Bergan Mercy Hospital the day before and indicated that he was surprised he did not get arrested. *Id.* at

492. On March 30, 2015, Titsworth reported being "afraid to get off the couch" and missing meals. *Id.* at 487. He also reported difficulty making decisions. *Id.*

In April 2015, Titsworth reported lack of sleep due to nightmares and so much anxiety he was unable get off the couch. *Id.* at 455-456. Group therapy notes indicate Titsworth had not engaged in group discussion and left group early, appearing to struggle with the topics discussed. *Id.* Titsworth sat with his head down and did not participate in group discussion. *Id.* at 969-970. He missed another appointment, stating he was "too depressed." *Id.* at 968. In August 2015, Titsworth reported to Dr. Faryna his depression had worsened and he stated he could not "get off the couch." *Id.* at 1046-1048. Dr. Faryna noted he was more anhedonic and more unmotivated. *Id.* at 1046.

On January 5, 2016, Titsworth reported to Ms. Evans that he was having increased anger and incidents of rage. *Id.* at 1152. He also reported increased nightmares which are usually related to his sexual assault. *Id.* Other evidence in the record shows Titsworth is prone to rage and anger outbursts and is limited in his ability to recognize hazards. *See, e.g., id.* at 491-494 (indicating Titsworth "blew up" a the nursing staff and "he is surprised that he did not get arrested"); 564-576 (Titsworth had suicidal thoughts and stated he was "close to pulling the trigger"); 681-684 (Titsworth got lost driving in St. Louis on his way back from Illinois even though he had been there many times before and normally knows his way around the city); 943-946 (Titsworth reported he "raged on a guy"); and 1152 (Titsworth became angry with another driver and got out of his car to confront the person).

D.     Veterans Administration Rating

Titsworth also applied to the VA for a service connected disability. *See id.* at 178. On June 19, 2014, Titsworth underwent a Veterans Administration Compensation and

Pension ("C&P")[4] examination for PTSD conducted by clinical psychologist John P. Engler, Ph.D. Dr. Engler found Titsworth had a diagnosis of PTSD that conformed to DSM-5 criteria based on the examination and also noted "[v]eteran has been given diagnosis of Unspecified Depressive Disorder in the past which is being considered as part of the PTSD symptomology at this time." *Id.* at 713. He concluded that Titsworth's level of occupational and social impairment due to his condition was "[o]ccupational and social impairment with reduced reliability and productivity". *Id.* at 713-714. Dr. Engler also found it "at least as likely as not the [military sexual trauma] stressor noted in the examination by the veteran of being held and raped while he was stationed at Chanute AFB and living in the dorm, has resulted in current PTSD diagnosis and symptoms." *Id.* at 726.

On April 29, 2015, Titsworth met with Dr. Matthew Peter for a VA examination. *Id.* at 943-946. Dr. Peter's notes show that Titsworth reported persistent symptoms since the sexual assault 37 years before, and stated the symptoms had worsened over the previous 10 years, "significantly impacting his daily functioning." *Id.* at 943. Dr. Peter noted the assault experience led to pronounced substance abuse and Titsworth's eventual discharge from the service. *Id.* Titsworth reported a suicide attempt in 1980. *Id.* at 944. Titsworth described himself as significantly withdrawn from others, unable to associate with friends or go to AA meetings as a result of anxiety. *Id.* Titsworth described "pronounced anxiety occurring daily and often including panic attacks of varying intensity" that had "dissipated slightly over the past several months with medication but continue to occur more than once

---

[4] C&P examinations are designed to obtain fundamental information that will be necessary for the final adjudication of a claim for disability benefits from the VA, including (where appropriate) the application of the VA Schedule for Rating Disabilities. *Kristjanson v. Colvin*, No. 16 CV 43 EJM, 2016 WL 6440132, at *2 (N.D. Iowa Oct. 28, 2016). C&P examinations for PTSD consist of a review of medical history; an assessment of the traumatic exposure or exposures; evaluations of mental status and of social and occupational function; and a diagnostic examination, which may include psychological testing or a determination of a Global Assessment of Functioning (GAF) score. *Id.*

per week." *Id.* at 944. He reported difficulty participating in AA because of hypervigilance and noting that "I raged on a guy" the last meeting he attended. *Id.* at 945. He also reported seeing moving "grey blobs". He reported he is often unable to tolerate work conditions for more than one hour and that he is often engaged in conflict with coworkers when not working in an isolated setting. *Id.* Dr. Peter found Titsworth demonstrated a wide range of symptoms associated with PTSD. *Id.* He appeared distracted and had difficulty concentrating. *Id.*

The VA first found Titsworth fifty-percent disabled as a result of PTSD, but Titsworth disagreed with that evaluation and sought review by a Decision Review Officer. *Id.* at 178. On review the VA increased Titsworth's disability rating from fifty-percent to one hundred percent. *Id.* at 178-221. The rating decision was based on the report from Dr. Peter and on Titsworth's:

-Intermittent inability to perform activities of daily living
-Total occupational and social impairment
-Intermittent inability to perform maintenance of minimal personal hygiene
-Memory loss for names of close relatives
-Difficulty in adapting to work
-Neglect of personal appearance and hygiene
-Obsessional rituals which interfere with routine activities
-Spatial disorientation
-Near-continuous panic affecting the ability to function independently, appropriately and effectively
-Difficulty in adapting to stressful circumstances
-Inability to establish and maintain effective relationships
-Difficulty in adapting to a worklike setting
-Disturbances of motivation and mood
-Flattened affect
-Difficulty in understanding complex commands
-Difficulty in establishing and maintaining effective work and social relationships
-Panic attacks more than once a week
-Impairment of short- and long-term memory
-Impaired judgment
-Circumlocutory speech
-Depressed mood

-Mild memory loss
　　　　-Chronic sleep impairment
　　　　-Anxiety [and]
　　　　-Suspiciousness

*Id.* at 179-80.　The VA found the "severity of [Titsworth's] disability most closely approximates the criteria for a 100 percent disability evaluation."　*Id.* at 180

　　　E.　　Medical Opinions

　　　　　1.　　Consultative Examinations

　　　On June 8, 2015, Dr. Patricia Newman, a non-examining state agency psychologist, completed a Psychiatric Review Technique ("PRT") and Mental Residual Functional Capacity ("MRFC") form for the Social Security Administration.　*Id.* at 73-77.　On the PRT, Dr. Newman opined Titsworth had mild restrictions in activities of daily living, moderate social limitations, moderate limitations with regard to concentration, persistence or pace, and no episodes of decompensation.

　　　On September 25, 2015, Titsworth was examined by consulting psychologist Barbara Eckert, Psy.D.　*Id.* at 1070-1074.　Her diagnostic impression was Post-traumatic Stress Disorder, Major Depressive Disorder Recurrent Severe, and "rule in rule out antisocial personality disorder."[5]　*Id.* at 1073.　She stated:

> Mark has a history of PTSD which may continue to be chronic or may decrease with therapy and medications.　His depression may decrease with treatment.　He appears to have limited to poor insight.　His substance use is a negative prognostic indicator.　His prognosis is guarded to poor.

*Id.*　She noted Titsworth appeared guarded and irritable and reported that he reached across the front counter and turned the TV off without permission.　*Id.* at 1072. He was evasive in his answers and described mood as "pissed off and almost in a rage," but stated

---

[5] A "rule-out" diagnosis is not a diagnosis. *Amaro v. Astrue*, 2011 WL 871474, *4 n. 4 (C.D. Ca. Mar. 14, 2011).　In the medical context, a "rule-out" diagnosis means there is evidence that the criteria for a diagnosis may be met, but more information is needed in order to rule it out. *Id.*

he was not violent.  *Id.*  Titsworth told Dr. Eckert that he had had a few hallucinations and had seen his dead mother in law in the yard and odd shapes running across the floor.  *Id.*  Dr. Eckert observed mild signs of tension and anxiety and she opined that Titsworth appeared to have some moderate difficulty with the ability to sustain attention and concentration for the interview, but stated he could understand, remember, and carry out short and simple instructions.  *Id.* at 1073-74.  Dr. Eckert wrote "Mark has worked but denied the ability to relate to supervisors and co-workers.  His behavior during our meeting may be indicative of his inability to get along with others in a work environment."  *Id.* at 1074.

A consulting psychologist, Lee Branham, Ph.D., completed a PRT and a MRFC form.  *Id.* at 86-90.  He relied on the opinion of Dr. Eckert, but concluded that her opinion was an overestimate of the severity of the individual's restrictions/limitations and based only on a snapshot of the individual's functioning.  *Id.* at 91.  On the PRT form, Dr. Branham indicated Titsworth had mild restrictions in activities of daily living; moderate limitations in social functioning; moderate restrictions in concentration, persistence or pace; and insufficient evidence for episodes of decompensation.  *Id.* at 87.  In assessing Titsworth's mental residual functional capacity, Dr. Branham found Titsworth had moderate limitations in 8 of 20 categories,[6] and opined, "[Titsworth's] conditions are likely to lead to moderate limitations in avoid distraction by others and being present and punctual at a job."  *Id.* at 89-90.  Further, he stated "[Titsworth's] stress tolerance is reduced to the point of moderate

---

[6] Dr. Branham found Titsworth moderately limited in the ability to maintain attention and concentration for extended periods; to perform activities within a schedule, to maintain regular attendance, and to be punctual within customary tolerances; to work in coordination with or in proximity to others without being distracted by them; to interact appropriately with the general public; to accept instructions and to respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; to respond appropriately to changes in work setting; and to set realistic goals or make plans independently of others.

limitations in adapting to changes in the work environment" and that "[h]is DA/A [drug addiction/alcoholism] creates moderate limitations in independent planning, in financial and other areas." *Id.* at 90.

### 2. Treating Medical Providers

Dr. Faryna, Titsworth's treating psychiatrist, also submitted a Mental Residual Functional Capacity assessment form. *Id.* at 1237-1242. She diagnosed Titsworth with PTSD, Major Depression and Anxiety Disorder, and assigned a current GAF[7] score of 45 with the highest GAF score in the past year of 50. *Id.* at 1237. She reported Titsworth's prognosis was poor. *Id.* In 12 of 20 work-related functions, Dr. Faryna rated Titsworth's ability to function independently, appropriately and effectively as Category IV, meaning his impairments would preclude performance for 15% or more of the 7.5 hour workday.[8] *Id.* at 1239-40. She indicated Titsworth was at "Category III" (precludes performance for 10% of the 7.5 hour workday) in the abilities to make simple work-related decisions; to interact appropriately with the general public; and to maintain socially appropriate behavior and to

---

[7] The Global Assessment of Functioning ("GAF") score is the clinician's judgment of the individual's overall level of functioning. *See* Diagnostic and Statistical Manual of Mental Disorders, DSM–IV-TR, 32 (4th ed. 2000). A GAF score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* at 34. A new edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-V) was released in 2013 and replaced the DSM-IV. The DSM-V "no longer uses GAF scores to rate an individual's level of functioning because of 'its conceptual lack of clarity' and 'questionable psychometrics in routine practice.'" *Alcott v. Colvin*, No. 4:13-CV-01074-NKL, 2014 WL 4660364, at *6 (W.D. Mo. Sept. 17, 2014).

[8] These included the abilities to understand, remember, and carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, to maintain regular attendance, and to be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday or workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; to accept instructions and to respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; to respond appropriately to changes in work setting; to travel in unfamiliar places or use public transportation; and to set realistic goals or make plans independently of others. *Id.* at 1239-40.

adhere to basic standards of neatness and cleanliness. *Id.* Further, she stated that if Titsworth were to work, he would likely be "off task" more than 30 percent of a typical work week, and likely miss on average an estimate of 5 days or more per month. *Id.* at 1241. Dr. Faryna reported the medical/clinical findings that supported her assessment were Titsworth's "[v]ery low stress tolerance. Severe depression, anxiety, mood swings. Poor concentration. Poor quality of sleep due to nightmares. Fatigue." *Id.* at 1240.

On March 16, 2016, social worker Colleen Evans also submitted a MRFC form. *Id.* at 1246-1252. With respect to Titsworth's prognosis, she stated: "Veteran may struggle with PTSD for the rest of his life. The intensity and severity of symptoms may change at times, but will most likely remain indefinitely." *Id.* at 1246. Ms. Evans opined if Titsworth were to work he would likely be "off task" more than 30 percent of a typical work week, and likely miss on average an estimate of 5 days or more per month. *Id.* at 1251. Ms. Evans also wrote the following, "Veteran would be limited in all areas of the workplace due to symptoms related to PTSD." *Id.* at 1250.

F.    The ALJ's Findings

The ALJ found Titsworth is not disabled. *Id.* at 19. He undertook the familiar five-step sequential process for determining disability.[9]   At step one, the ALJ found that Titsworth had engaged in substantial gainful activity following his alleged onset date, but nonetheless proceeded to make a determination of disability for the entire period of

---

[9] *See Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir.2005) ("During the five-step process, the ALJ considers (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work") (quotation and citation omitted)).

disability from December 31, 2013, through the date of adjudication.[10]  *Id.* at 12.  Next, at

step two, the ALJ found that Titsworth's mood disorder and post-traumatic stress disorder

were severe impairments.  *Id.*  He stated that Titsworth had also been diagnosed with a

substance use disorder, but found that disorder was neither material nor severe.  *Id.* at 13.

At step three, the ALJ found that Titsworth had no impairment that met or medically equaled

a listed impairment.  *Id.* at 13–14.  He considered the criteria in the listings at § 12.04 (for

affective disorders) and § 12.06 (for anxiety-related disorders).[11]  *Id.* at 13.  The ALJ then

determined that Titsworth had the RFC to 'perform a full range of work at all exertional

levels but with the following nonexertional limitations:

> He can only perform work that does not require him to work in tandem, as a
> partner, or in close coordination with others or to engage in more than brief,
> superficial, and incidental interaction with the public. He is able to perform
> simple work and to respond appropriately to routine changes in a work
> environment.

*Id.* at 14.  In making this finding, the ALJ discounted the opinions of Titsworth's treating

mental health practitioners, affording them only "some weight" to the opinions that Titsworth

"is limited in terms of social interaction and performing skilled work."  *Id.* at 17.  The ALJ

provided the following rationale for giving "little weight to the remaining aspects of Dr.

Faryna's and Ms. Evans' opinions":

---

[10] The record indicates that the Social Security Administration may have regarded Titsworth's efforts as an unsuccessful work attempt.  *Id.* at 12, 84.

[11] Effective January 17, 2017, PTSD is evaluated under a new listing: § 12.15 (trauma and stressor-related disorders).  *See* 81 FR 66138, 2016 WL 5341732 at *1 (Sept. 26, 2016); 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.00(B)(11), 12.15 (text of section 12.00 effective on Jan. 17, 2017).  Prior to the effective date of the new listing, PTSD was evaluated under § 12.06 (anxiety related disorders). *See Bittles v. Astrue*, 777 F. Supp. 2d 663, 666 (S.D.N.Y. 2011) ("To meet the required level of severity for PTSD, a claimant must provide medical documentation for the criteria listed in Section 12.06(A) [diagnostic criteria] and Section 12.06(B)[functional limitations].").

The requirements set forth in the version of § 12.06(A) in effect at the time of the ALJ's decision mirror the diagnostic criteria of the DSM-IV.  *Compare* § 12.06A (effective Dec. 3, 2013 to Feb. 25, 2014) *with* DSM-IV at 327, 332, 335, 357.  The current requirements of § 12.15 mirror the diagnostic criteria of the DSM-5.  *See* 81 FR 66138, 2016 WL 5341732 at *1.

> (1) although Dr. Faryna and Ms. Evans concluded that the claimant would miss at least 5 days of work per month, their notes do not indicate that he ever missed appointments with medical sources or other important events in his life;
>
> (2) neither Dr. Faryna nor Ms. Evans provided a rationale for their opinion or identified what objective findings or observations supported their opinion;
>
> (3) even though Dr. Faryna's treatment notes do not contain any findings or observations of decreased concentration or attention, she opined that he would be off task 30% of the time; and
>
> (4) they both indicate he has limits in "recognizing hazards." Again, there is no hint in the record that this is so. This unsupported conclusion tends to detract from the weight they are due.

*Id.* at 17.

He also discredited Titsworth's testimony as to the "intensity, persistence and limiting effects" of complaints of "(1) daily thoughts of suicide; (2) 'overwhelming' anxiety; (3) depression; (4) 'almost constant' nightmares; (5) bouts of rage; (6) flashbacks that occur 3 to 4 times each week and last 15 to 30 minutes each; (7) anxiety attacks that last 15 to 30 minutes; (8) poor concentration and memory; (9) paranoia; (10) being easily stressed; and (11) fatigue." *Id.* at 14. Although he found Titsworth's "medically determinable impairments could reasonably be expected to cause at least some of the alleged symptoms," he found Titsworth's testimony as to the nature and extent of his symptoms was not entirely credible. *Id.* at 15. The ALJ based that finding on certain discrepancies in his tax returns, including mileage claimed, evidence that Titsworth had cared for his wife, Titsworth's failure to mention going to AA meetings at the hearing, lack of evidence of outbursts at group sessions, and "most importantly" that Titsworth did not seek treatment for his mental impairments until the end of 2013. *Id.* at 15-16. Further, he found Titsworth's reports of hallucinations had not been reported to his treating mental health practitioners, noting that

"[h]e mentioned them only in [a] setting where his behavior would influence (and increase) the amount of his VA benefits." *Id.* at 16.

The ALJ also afforded little weight to the fact that the VA assigned Titsworth a disability rating of 100% based on PTSD. *Id.* at 16-17. He rejected the VA's finding that Titsworth has significant functional limitations, but acknowledged there was evidence that Titsworth "can have difficulties with concentration and social interactions." *Id.* He explained "the undersigned gives little weight to the VA's disability rating primarily because they are not 'medical opinions' in that they do not include conclusions about his specific functional limitations." *Id.* Further, the ALJ noted:

> Those statements and ratings are not useful in determining the claimant's residual functional capacity because—
>
>> (1) The VA applies a different standard and different criteria in determining whether a claimant will receive benefits;
>>
>> (2) The ratings are those of an unknown person with unknown credentials;
>>
>> (3) The 100% rating is largely based on an evaluation conducted by Matthew M. Peter, Psy. D., during which the claimant's only abnormal behavior was sitting facing the exit;
>>
>> (4) The explanation for the findings cites many extreme symptoms, such as memory loss and impaired judgment, that are not substantiated by other evidence; and
>>
>> (5) it cites to some symptoms (obsessive rituals, near-continuous panic) about which the claimant has not complained to his medical providers and which are never observed or mentioned in the voluminous records.

*Id.* at 17 (citations to record omitted).

At step four, the ALJ found Titsworth unable to perform "his past relevant work as a painter (DOT #840.381-010), which is classified by the Dictionary of Occupational Titles as skilled (SVP 7), medium work, … due to its skill level." *Id.* at 18. The ALJ went on to find at

step five that Titsworth's ability to perform work at all exertional levels was compromised by nonexertional limitations.  *Id.* at 18-19.  Based on the testimony of a vocational expert, the ALJ found there are jobs existing in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity.  *Id.* at 19.  He found Titsworth would be able to perform the requirements of representative unskilled, medium occupations such as an industrial cleaner; night janitor and production welder.  *Id.*

Titsworth argues that the ALJ's RFC is not supported by substantial evidence because the ALJ did not properly evaluate his 100 percent disability rating from the VA and the evidence that supports it.  Further, he argues that the ALJ committed legal error in misinterpreting VA policy and thus discounting the VA determination.  Additionally, Titsworth contends the ALJ failed to properly evaluate the underlying medical opinion from Dr. Peter, impermissibly ignored Dr. Engler's opinion, and did not afford appropriate weight to the opinions of the claimant's treating mental health providers, Dr. Faryna and Ms. Evans.

II.     LAW

A.     Standard of Review

The court reviews a denial of benefits by the Commissioner to determine whether the denial is supported by substantial evidence on the record as a whole.  *Teague v. Astrue,* *638 F.3d 611, 614 (8th Cir. 2011).*  Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion.  *Id.*  The court must consider evidence that both supports and detracts from the ALJ's decision, and will not reverse an administrative decision simply because some evidence may support the opposite conclusion.  *Perkins v. Astrue,* 648 F.3d 892, 897 (8th Cir. 2011).  However, the court's review is "more than a search of the record for evidence supporting the

Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp'" of the Commissioner's decision. *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 821 (8th Cir. 2008). In determining whether substantial evidence in the record supports the decision, the court must consider evidence that both detracts from and bolsters the Commissioner's decision. *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000) (citations omitted).

The court must also determine whether the Commissioner's decision "is based on legal error." *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000) (citations omitted). The court owes no deference to the Commissioner's legal conclusions. *See Juszczyk v. Astrue*, 542 F.3d 626, 633 (8th Cir. 2008).

B.     Sequential Analysis

To determine whether a claimant is entitled to disability benefits, the ALJ performs a five-step sequential analysis. 20 C.F.R. § 404.1520(a)(4). At step one, the claimant has the burden to establish that he has not engaged in substantial gainful activity since his alleged disability onset date. *Cuthrell v. Astrue*, 702 F.3d 1114, 1116 (8th Cir. 2013). At step two, the claimant has the burden to prove he has a medically determinable physical or mental impairment or combination of impairments that significantly limits his physical or mental ability to perform basic work activities. *Id.* At step three, if the claimant shows that his impairment meets or equals a presumptively disabling impairment listed in the regulations, he is automatically found disabled and is entitled to benefits. *Id.* If not, the ALJ determines the claimant's residual functional capacity (RFC), which is used at steps four and five. 20 C.F.R. § 404.1520(a)(4).

A claimant's RFC is what he can do despite the limitations caused by any mental or physical impairments. *Toland v. Colvin*, 761 F.3d 931, 935 (8th Cir. 2014); 20 C.F.R. § 404.1545. The ALJ is required to determine a claimant's RFC based on all relevant

evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations. *Papesh v. Colvin*, 786 F.3d 1126, 1131 (8th Cir. 2015). The RFC must (1) give appropriate consideration to all of a claimant's impairments, and (2) be based on competent medical evidence establishing the physical and mental activity that the claimant can perform in a work setting. *Mabry v. Colvin*, 815 F.3d 386, 390 (8th Cir. 2016).

At step four, the claimant has the burden to prove he lacks the RFC to perform his past relevant work. *Cuthrell*, 702 F.3d at 1116. If the claimant can still do his past relevant work, he will be found not disabled; otherwise, at step five, the burden shifts to the Commissioner to prove, considering the claimant's RFC, age, education, and work experience, that there are other jobs in the national economy the claimant can perform. *Id.*; see *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010).

C. Treating Physician

The ALJ must give "controlling weight" to a treating physician's opinion if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence. *Papesh,* 786 F.3d at 1132. Even if not entitled to controlling weight, a treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. *Id.* The regulatory framework requires the ALJ to evaluate a treating sources' opinion in consideration of factors such as length of treatment, frequency of examination, nature and extent of the treatment relationship, support of opinion afforded by medical evidence, consistency of opinion with the record as a whole, and specialization of the treating source. *Id.*; see 20 C.F.R. 404.1527(c)(2). "When an ALJ discounts a treating [source's] opinion, he should give good reasons for doing so." *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007); *Jenkins v. Apfel*, 196 F.3d 922, 924-

25 (8th Cir. 1999) (stating the ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions).

D.   Vocational Expert Testimony

To satisfy the burden to show the claimant is capable of performing other work, the ALJ is generally required to utilize testimony of a vocational expert if the claimant suffers from nonexertional impairments that limit her ability to perform the full range of work described in one of the specific categories set forth in the guidelines. *Jones,* 619 F.3d at 971–72. In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments. 20 C.F.R. §§ 404.1520(a)(4)(v); *see Taylor v. Chater*, 118 F.3d 1274, 1278 (8th Cir. 1997) (stating that a vocational expert's testimony may be considered substantial evidence "only when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies"). "When a hypothetical question does not encompass *all relevant impairments*, the vocational expert's testimony *does not constitute substantial evidence.*" *KKC ex rel. Stoner v. Colvin*, 818 F.3d 364, 377 (8th Cir. 2016) (quoting *Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir. 2001)) (emphasis added in *KKC*).

E.   Subjective Complaints

The ALJ must evaluate subjective complaints with full consideration to all of the evidence presented and may not discount a claimant's allegations solely because objective medical evidence does not fully support them. *O'Donnell v. Barnhart*, 318 F.3d 811, 816 (8th Cir. 2003). In evaluating a claimant's allegations, in addition to the objective medical evidence, an ALJ must consider a claimant's prior work history, observations by third parties

and treating and examining physicians relating to such matters as: 1) the claimant's daily activities; 2) the duration, frequency and intensity of the pain; 3) precipitating and aggravating factors; 4) dosage, effectiveness and side effects of medication; 5) functional restrictions. *Id.* Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole. *Jackson v. Apfel*, 162 F.3d 533, 538 (8th Cir. 1998). "A claimant's allegations of disabling pain may be discredited by evidence that the claimant has received minimal medical treatment and/or has taken only occasional pain medications." *Singh*, 222 F.3d at 453; *see O'Donnell*, 318 F.3d at 818 (questioning "whether a claimant who is intentionally exaggerating her symptoms for financial gain would seek out" extensive treatment and evaluations); *Cox v. Apfel*, 160 F.3d 1203, 1207 (8th Cir. 1998) (questioning whether a claimant with many "years of medical records detailing repeated complaints of severe pain" and treatments for severe pain could be found not credible).

      F.     Mental Illness

An ALJ cannot rely on the claimant's ability to perform limited functioning during a period of low stress as substantial evidence that a claimant who sometimes experiences high stress is not disabled. *Hutsell v. Massanari,* 259 F.3d 707, 713 (8th Cir. 2001). Given the unpredictable course of mental illness, "[s]ymptom-free intervals and brief remissions are generally of uncertain duration and marked by the impending possibility of relapse." *Andler v. Chater*, 100 F.3d 1389, 1393 (8th Cir. 1996). Moreover, "[i]ndividuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms." 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.00(E). "Such individuals may be much more impaired for work than their signs and symptoms would indicate." *Id.*

III.    DISCUSSION

The court finds there is not substantial evidence in the record to support the ALJ's finding that Mark E. Titsworth is not disabled. In making his determination, the ALJ relied on consulting physicians' and mental health providers' mental residual functional capacity assessments and placed little weight on the opinions of Titsworth's treating practitioners' opinions. The ALJ erred in affording little weight to Dr. Faryna's opinion regarding Titsworth's limitations, without giving legally sufficient reasons for doing so. The factors ALJ's should consider in weighing medical opinions weigh in favor of granting the treating physicians' opinions considerable, if not controlling weight. Dr. Faryna is a specialist with knowledge of PTSD. She treated Titsworth on a monthly basis for several years. Her treatment notes are consistent with her opinions. Similarly, Ms. Evans had an extensive treatment history with Titsworth. She observed him on numerous occasions and her notes are also consistent with her opinions. Both treatment providers stated that Titsworth had moderate or marked limitations in areas of functioning that are essential to employment. Their opinions that Titsworth would likely be off-task thirty percent of the time and was likely to miss five or more days of work per month are amply supported by the record. The ALJ's reliance on Titsworth's never having missed medical appointments or other important events in his life is misplaced. The record shows numerous instances of Titsworth's absenteeism or unreliability. Similarly, the record shows Titsworth consistently reported problems with short-term memory and impaired judgment.

The ALJ similarly failed to afford appropriate weight to the VA's 100% disability rating. Although Social Security and VA standards for disability vary, the basis for the VA's disability rating dovetail with the Social Security Administration's functional limitations. There is considerable congruity between Dr. Peter's listed disabling traits and functional criteria the SSA uses to evaluate how a mental disorder limits areas of mental functioning a

person uses in a work setting—as the abilities to understand, remember and apply information; to concentrate, persist, or maintain pace; and to adapt or manage oneself. The VA's examining psychologist's opinion that Titsworth's panic affected his ability to function independently, appropriately and effectively, that he had difficulty adapting to stressful circumstances and work-like settings, difficulty in understanding complex commands, impairment of short and long term memory, impaired judgment, chronic sleep impairment, and difficulty in establishing and maintaining effective work and social relationships were supported by the record, consistent with the treating physician's assessment and should have been considered. Dr. Peter's findings that Titsworth experienced bouts of anger and rage that are not compatible with the ability to sustain employment are also documented in the record.

The ALJ also erred in discounting Titsworth's subjective complaints of disabling flashbacks, panic attacks and nightmares. Those symptoms are consistent with his disorder. The extent of the treatment he sought is comparable to such a level of severity of the complaints. Also, the ALJ discredited Titsworth's testimony, in part, because Titsworth delayed treatment for many years after the traumatizing event, without considering Titsworth's reasons for doing so. The record shows Titsworth's symptoms worsened shortly before he sought treatment and were triggered by recent events. Moreover, Titsworth obtained extensive treatment, which adds to his credibility. Also, the ALJ's credibility determination was based on several factual inaccuracies. There is evidence in the record that Titsworth had historically reported unusual perceptions and memory loss to doctors other than Dr. Peter. The implication that Titsworth was exaggerating his symptoms for financial gain was thus in error.

Because the ALJ failed to appropriately credit the medical evidence and Titsworth's testimony of disabling limitations, the ALJ presented a hypothetical to the VE that did not accurately reflect Titsworth's impairments and limitations. The VE's opinion therefore does not constitute substantial evidence to satisfy the Commissioner's burden to prove there are jobs in the national economy that a person with Titsworth's impairments can perform. Crediting Titsworth's testimony with respect to disabling flashbacks, panic attacks, and bouts of rage, and affording the treating mental health providers opinions substantial, if not controlling weight, the record supports the finding that Titsworth's impairments—including more than five absences per month, a need for frequent breaks, inability to carry out instructions or appropriately interact with supervisors or co-workers—would preclude employment.

A reversal and remand for an immediate award of benefits is appropriate where the record overwhelmingly supports a finding of disability. *Taylor,* 118 F.3d at 1279. The court finds that "the clear weight of the evidence fully supports a determination [Titsworth] is disabled within the meaning of the Social Security Act." *See Pate-Fires v. Astrue*, 564 F.3d 935, 947 (8th Cir. 2009). The Eighth Circuit has repeatedly approved of immediately awarding benefits based on the controlling weight afforded to the opinion of a claimant's treating medical provider. *See id.*; *Shontos v. Barnhart*, 328 F.3d 418, 427 (8th Cir. 2003); *Cunningham v. Apfel*, 222 F.3d 496, 503 (8th Cir. 2000); *Singh*, 222 F.3d at 453; *but see Papesh*, 786 F.3d at 1135-36. Where further hearings would merely delay receipt of benefits, an order granting benefits is appropriate. *Hutsell,* 259 F.3d at 714 (8th Cir. 2001). Accordingly,

IT IS ORDERED:

1.      The plaintiff's motion to reverse (Filing No. 14) is granted;

2.      The defendant's motion to affirm (Filing No. 17) is denied;

3.      The decision of the Commissioner is reversed;

4.      This action is remanded to the Social Security Administration for an award of

benefits.

Dated this 16th day of August, 2017.

                                        BY THE COURT:

                                        s/ Joseph F. Bataillon
                                        Senior United States District Judge